IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MELISSA S.,

        **Plaintiff,**

v.                                       **Case No.: 2:23-cv-00620**

MARTIN J. O'MALLEY,
**Commissioner of the**
**Social Security Administration,**

        **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383f. The matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings, as articulated in their briefs. (ECF Nos. 6, 7).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 6); **GRANT** Defendant's request to affirm the Commissioner's decision, (ECF No. 7); **AFFIRM** the decision of

the Commissioner; and **DISMISS** this action and **REMOVE** it from the docket of the Court.

## I.    Procedural History

On July 27, 2020, Plaintiff Melissa S. ("Claimant"), protectively filed for SSI, alleging a disability onset date of June 1, 2012 due to "PTSD, mood disorder, sleep disorder, panic disorder, paranoid schizophrenia, supraventricular tachycardia, severe scoliosis, and manic depression." (Tr. at 24, 213, 227). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 24). Claimant amended her alleged onset date to July 27, 2020. (Tr. at 221). She filed a request for an administrative hearing, which was held on December 23, 2022 before the Honorable Nathan Brown, Administrative Law Judge (the "ALJ"). (Tr. at 51-75). By written decision dated February 9, 2023, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 21-50). The ALJ's decision became the final decision of the Commissioner on July 27, 2023 when the Appeals Council denied Claimant's request for review. (Tr. at 1-7).

Claimant timely filed the present civil action seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed a Transcript of Proceedings. (ECF No. 5). Claimant then filed a Brief, seeking judgment on the pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision to which Claimant filed a Reply. (ECF Nos. 6, 7, 8). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 44 years old on her protective filing date and 47 years old on the date of the ALJ's decision. (Tr. at 38). She completed the tenth grade, communicates in

English, and does not have any past relevant work. (Tr. at 38, 226, 228).

### III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the

performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe

4

unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(4).

An additional analysis is performed if a claimant has a medically determinable substance use disorder. Title 42 U.S.C. § 1382c(a)(3)(J) states that "[a]n individual shall not be considered disabled [...] if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." Thus, if a claimant is determined to be disabled under the five-step sequential evaluation process, but he or she is also found to have a drug or alcohol addiction, the ALJ must assess whether the addiction is a substantial contributing factor to the claimant's disability. Title 20 C.F.R. § 416.935 sets forth how this assessment is made:

(a) General. If we find that you are disabled and have medical evidence of

your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability, unless we find that you are eligible for benefits because of your age or blindness.

(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.

(1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 416.935.

SSR 13-2p provides additional guidance for determining materiality of a drug or alcohol addiction. SSR 13-2p, 2013 WL 621536 (Feb. 20, 2013). The Ruling utilizes the terms "drug addiction" and "alcoholism," referred to as "DAA," because those terms are used in the Social Security Act. *Id.* at *3. However, SSR 13-2p defines DAA as Substance Use Disorders, including Substance Dependence and Substance Abuse, excluding nicotine use disorders. *Id.* When an ALJ determines that a claimant suffers from a medically determinable DAA, the ALJ first applies the sequential evaluation including the DAA. *Id.* at *5. If the ALJ finds that the claimant is disabled considering the DAA, the ALJ performs the sequential evaluation again without considering the DAA to

6

determine whether the claimant's other impairments are themselves disabling, and, if not, whether the impairments are caused or affected by the DAA to the extent that they would no longer be disabling absent the DAA. *Id.* at \*7-9.

Here, at the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since her alleged onset date. (Tr. at 27, Finding No. 1). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: obesity, degenerative disc disease and dextroscoliosis, paroxysmal supraventricular tachycardia (SVT),[1] depressive disorder, anxiety disorder, bipolar disorder, post-traumatic stress disorder (PTSD), somatic symptom disorder, and substance abuse disorder. (Tr. at 27, Finding No. 2). The ALJ also considered Claimant's COVID-19 infection, restless leg syndrome, and vitamin D deficiency, but the ALJ concluded that the impairments were non-severe. (Tr. at 27-28). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 28-31, Finding No. 3).

Accordingly, the ALJ determined that based on all of Claimant's impairments, including her substance use, Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can reach frequently bilaterally. The claimant can climb ramps and stairs frequently, never climb ladders, ropes, or scaffolds, balance frequently, stoop frequently, kneel frequently, crouch frequently, and crawl occasionally. The claimant can work at unprotected

---

[1] "Supraventricular tachycardia (SVT) is a type of irregular heartbeat, also called an arrhythmia. It's a very fast or erratic heartbeat that affects the heart's upper chambers. SVT also is called paroxysmal supraventricular tachycardia. The typical heart beats about 60 to 100 times a minute. During SVT, the heart beats about 150 to 220 times a minute. Occasionally it beats faster or slower. Most people with supraventricular tachycardia don't need treatment. When recommended, treatment may include specific actions or movements, medicines, a heart procedure, or a device to control the heartbeat." *See* https://www.mayoclinic.org/diseases-conditions/supraventricular-tachycardia/symptoms-causes/syc-20355243.

heights never, around moving mechanical parts never, and in vibration frequently. She can operate a motor vehicle never. She is limited to performing simple and repetitive work. After her initial training period, she can interact occasionally with supervisors, coworkers, but never with the public. She needs a low-stress work environment defined as one involving no greater than occasional changes in a routine work setting. She needs frequent supervision. She will be absent 12 days during the course of the year.

(Tr. at 31-37, Finding No. 4).

At the fourth step, the ALJ determined that Claimant had no past relevant work. (Tr. at 37-38, Finding No. 5). Therefore, under the fifth inquiry, the ALJ assessed Claimant's age and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 38-39, Finding Nos. 6-9). The ALJ noted that (1) Claimant was a younger individual age 18-49, (2) she had a limited education, and (3) transferability of job skills was not material to the disability determination because Claimant had no prior relevant work. (Tr. at 38, Finding Nos. 6-8). Considering these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that based on all of her impairments, including her substance use disorder, Claimant could not perform any jobs that existed in significant numbers in the national economy and was disabled. (Tr. at 38-39, Finding No. 9).

The ALJ then performed the sequential evaluation a second time to determine if Claimant would still be disabled excluding her substance use. The ALJ found that if Claimant's stopped using substances the remaining limitations would cause more than a minimal impact on her ability to perform basic work activities; therefore, she would have a severe impairment or combination of impairments notwithstanding substance use. (Tr. at 39, Finding No. 10). The ALJ determined that if Claimant stopped using substances, she would not have an impairment or combination of impairments that met

or medically equaled any of the impairments contained in the Listing. (Tr. at 39-41, Finding No. 11). After careful consideration, the ALJ found that if Claimant ceased substance use she had:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can reach frequently bilaterally. The claimant can climb ramps and stairs frequently, never climb ladders, ropes, or scaffolds, balance frequently, stoop frequently, kneel frequently, crouch frequently, and crawl occasionally. The claimant can work at unprotected heights occasionally, around moving mechanical parts occasionally, and in vibration frequently. She can operate a motor vehicle frequently. She is limited to performing simple and repetitive tasks. After her initial training period, she can interact occasionally with supervisors and coworkers but never with the public. She needs a low-stress work environment defined as one involving no greater than occasional changes in a routine work setting.

(Tr. at 41-43, Finding No. 12).

The ALJ proceeded to evaluate Claimant's age, education, and work history in combination with her RFC to determine her ability to engage in substantial gainful activity, excluding her substance use. (Tr. at 43-44, Finding Nos. 13-15). Considering these factors and the testimony of a vocational expert, the ALJ determined that if Claimant stopped using substances, she could perform jobs that existed in significant numbers in the national economy, including unskilled work as a housekeeper, price marker, or office helper. (Tr. at 43-44, Finding No. 15). Thus, the ALJ found that Claimant's substance use disorder was a contributing factor material to the determination of disability, she would not be disabled if she stopped using substances, and she was not disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of the decision. (Tr. at 44, Finding No. 16).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant argues that the ALJ violated SSR 13-2p by finding that her substance

use disorder was a contributing factor material to her disability. (ECF No. 6 at 2). In response, the Commissioner contends that the ALJ properly considered and evaluated the materiality of Claimant's DAA. (ECF No. 7 at 10-19). Claimant asserts in her reply that the ALJ not only failed to develop the evidence, but he also failed to consider the evidence before him regarding the impact and materiality of her substance use disorder. (ECF No. 8 at 3).

## V.    **Relevant Evidence**

The undersigned reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### *A. Treatment and Examination Records*

On May 14, 2019, Claimant presented to the Emergency Department (ED) at Tug Valley Area Regional Hospital, complaining of high blood pressure and headache. (Tr. at 349). Claimant did not have any history of high blood pressure, but she had a history of SVT. (*Id*.). Her blood pressure was elevated, but controlled, and her SVT symptoms resolved with medication. (Tr. at 349-51). At that point, Claimant's pulse was 59 beats per minute,[2] and her EKG showed normal sinus rhythm. (Tr. at 350-51).

Claimant returned to the ED on July 21, 2020, reporting chest pain and a racing heart that she believed to be caused by SVT. (Tr. at 1431). The onset of her symptoms was 10 minutes prior to her arrival. (*Id*.). Claimant denied drinking alcohol or using substances. (Tr. at 1433). She was diagnosed with SVT, and she again returned to normal sinus rhythm after the administration of the medication adenosine. (Tr. at 1440-41). During a cardiology follow-up appointment on July 23, 2020, Claimant denied

---

[2] "The normal pulse for healthy adults ranges from 60 to 100 beats per minute." *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/vital-signs-body-temperature-pulse-rate-respiration-rate-blood-pressure.

substance use, abnormal sleep pattern, anxiety, depression, or panic attacks. (Tr. at 1239-40). Her psychiatric findings were grossly normal. (Tr. at 1241-42). Claimant's EKG showed a heartrate of 65 beats per minute and sinus arrhythmia. (Tr. at 1242).

On January 8, 2021, Claimant presented to the ED due to SVT symptoms that did not respond to the dose of adenosine administered by EMS. (Tr. at 2136). Claimant stated that her symptoms started 30 minutes prior to calling EMS. (*Id*.). She was reportedly scheduled for ablation on January 18, 2021. (*Id*.). Claimant denied alcohol and substance use. (Tr. at 2138). Her SVT resolved after a second dose of adenosine, and she felt much better. (Tr. at 2139). On February 2 and March 14, 2021, Claimant went to the ED for SVT symptoms, which resolved with adenosine. (Tr. at 2091, 2094, 2112, 2114, 2115). She denied alcohol and substance use. (Tr. at 2093, 2114). Subsequently, on July 16, 2021, Claimant went to the ED with heart palpitations, which resolved on their own. (Tr. at 2243, 2245). Claimant denied using alcohol or substances, and she was advised to increase her intake of potassium. (Tr. at 2244, 2248).

On September 23, 2021, Claimant established with a primary care provider after not seeing one for a number of years. (Tr. at 1248). She was still a heavy smoker, but supposedly had no history of alcohol use. (Tr. at 1249-50). Claimant's pulse was 76 beats per minute, and she was in normal sinus rhythm. (Tr. at 1251-52). Three days later, Claimant was again in the ED because her heart was "racing" for the past hour, which was making her feel anxious. (Tr. at 1954). Claimant denied alcohol and substance use. (Tr. at 1956). She was diagnosed with SVT. (Tr. at 1959). Claimant presented as a new patient to an electrophysiologist on October 12, 2021 because she wanted more aggressive treatment for SVP. (Tr. at 1256). She resisted having an ablation, but she agreed to start medication. (Tr. at 1256, 1259). Claimant was noted to be a heavy smoker,

who denied any history of alcohol use. (Tr. at 1257). Her pulse was 62 beats per minute, and there were no abnormalities in her cardiac examination. (Tr. at 1258-59). On March 18 and April 22, 2022, Claimant presented to the ED with SVT symptoms that resolved with adenosine. (Tr. at 3619, 3625, 3634, 3638-39). She denied using alcohol or substances. (Tr. at 3621, 3636). Claimant returned to the ED with heart palpitations on May 2, 2022, but she felt better once placed in the bed and left without treatment. (Tr. at 3612, 3615).

On July 19, 2022, Claimant checked herself into Highland Hospital for depression. (Tr. at 3541). She claimed that she used cocaine four times in the past few days because she saw a YouTube video, indicating that it would make her feel better. (Tr. at 3542). She denied using cocaine before and said that it made her mood worse. (*Id.*). It was noted in Claimant's chart that she probably used cocaine more than a few times and had not been "very open about it." (*Id.*). The discharge summary on July 25, 2022 stated that Claimant had come in after doing "a lot of cocaine." (Tr. at 3546). She was detoxed from any substances and advised to go to a sober living house, but she refused. (*Id.*).

When Claimant returned to the ED for rapid heartbeat on September 8, 2022, she again denied using alcohol or substances. (Tr. at 3754, 3756). However, this time she was drug tested, and her urine screen was positive for cocaine. (Tr. at 3762). Claimant stated that she would speak to her physician in the morning about detox, but she did not want a referral to Mountain Comprehensive Care Center. (Tr. at 3756). She was diagnosed with "substance abuse, SVT" and instructed on drug abuse and addiction and SVT. (Tr. at 3763). Claimant denied psychological symptoms and her psychiatric examination findings were normal. (Tr. at 3583).

On September 16, 2022, Claimant presented for a psychiatric evaluation because she wanted to "detox from alcohol and cocaine." (Tr. at 3846). She stated that she began drinking alcohol at age 21 and started using cocaine at age 38. (*Id.*). She was reportedly sober for seven years, but she began using again in January. (*Id.*). Claimant currently drank three tall cans of beer and snorted two grams of cocaine per day. (*Id.*). She admitted that she used cocaine every night for about three months and was taken to the ED four days earlier for SVT with a heart rate over 200 due to cocaine usage. (Tr. at 3857). She stated that she needed help to "get off cocaine." (*Id.*). Claimant was passive aggressive during the interview, explaining that she was upset that she could not have Klonopin and Xanax together during her stay. (Tr. at 3851). Her pulse was 84 beats per minute. (Tr. at 3853).

Claimant returned to the ED on October 28, 2022 for heart palpitations, shortness of breath, and chest pain. (Tr. at 3650). She was given adenosine and returned to normal sinus rhythm. (*Id.*). She followed up the next day to rule out myocardial infraction protocol and for further cardiac workup. (*Id.*). Claimant still denied using substances, but she admitted to drinking alcohol on holidays/special occasions. (Tr. at 3651, 3658). Her urine screen was again positive for cocaine. (Tr. at 3657). It was noted that Claimant frequently visited the ED for the same symptoms and was treated with adenosine and discharged. (Tr. at 3657). Claimant was diagnosed with SVT and substance use. (Tr. at 3663). She refused a stress test and was advised that she was at risk of a heart attack due to her "associated cardiac condition and cocaine use." (Tr. at 3664). Claimant was explicitly told to cease her recreational drug use. (Tr. at 3666). Claimant's psychiatric examination findings were grossly normal. (Tr. at 3720).

### B. *Opinion Evidence*

On March 8, 2021, psychologist Nicole M. Smith, M.A., examined Claimant, who denied any history of alcohol or drug abuse. (Tr. at 1219). Ms. Smith diagnosed Claimant with post-traumatic stress disorder, panic disorder, bipolar I disorder, and somatic symptom disorder. (Tr. at 1220). On April 20, 2021, Amy McKenzie, APRN, examined Claimant. Claimant reported a history of 20 episodes of SVT over the past five to six years. (Tr. at 1225). Claimant said that she went to the ED each time and received adenosine. (*Id.*). She started taking medication for SVT, but it decreased her heart rate too much, and magnesium and potassium were not helping, so Claimant intended to follow up with her physician next month. (*Id.*). Claimant's pulse was 65 beats per minute with normal sinus rhythm. (Tr. at 1226). She did not have any chest pain or problems with exertion, shortness of breath, or tachycardia during the examination. (Tr. at 1228).

On May 4, 2021, Jeff Boggess, PH.D., assessed that Claimant had the mental RFC to perform routine and repetitive tasks in a work-like setting that had limited contact with the general public. (Tr. at 96, 98). Dr. Boggess did not cite any diagnoses or findings related to substance use. (Tr. at 88-89, 94-98). On the same date, Fulvio Franyutti, M.D., assessed that Claimant had the physical RFC to perform medium exertional work that involved frequent postural activities, other than occasional crawling and never climbing ladders, ropes, or scaffolds, as well as no concentrated exposure to hazards. (Tr. at 92-94). Dr. Franyutti found that there was "no evidence of any substance abuse disorder/DAA issue." (Tr. at 99).

At the reconsideration level of review, on February 22, 2022, Amy Wirts, M.D., assessed that Claimant could perform medium exertional work with frequent postural activities except for occasional climbing of ramps or stairs; crawling; and balancing and

14

never climbing ladders, ropes, or scaffolds with no concentrated exposure to extreme cold, vibration, or hazards. (Tr. at 107). Dr. Wirts agreed that there was "no evidence of any substance abuse disorder/DAA issue." (Tr. at 109). Timothy Saar, Ph.D., assessed on March 3, 2022 that Claimant could process and recall work like procedures with reduced public interaction. (Tr. at 108). Dr. Saar did not mention substance use. (Tr. at 105-06, 108).

### C. Claimant's Statements

Claimant testified during her administrative hearing on December 23, 2022 that she was no longer using cocaine and was randomly drug tested in her outpatient mental health program, as well as when she saw her physician. (Tr. at 59). She took an Antabuse pill to help with her alcohol addiction. (*Id*.).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589

15

(4th Cir. 1996)). Rather, the Court's role is limited to ensuring that the ALJ followed applicable regulations and rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  **Discussion**

Claimant asserts that the ALJ's conclusion that her substance use disorder was a contributing factor material to the determination of disability was unsupported, unexplained, and violative of SSA's own policy set forth in SSR 13-2p. (ECF No. 6 at 2). However, the ALJ properly performed the process specified in SSR 13-2p. The ALJ first applied the sequential evaluation to determine whether Claimant was disabled considering her DAA. (Tr. at 27-39). The ALJ determined that while using drugs Claimant would be absent from work 12 days per year for drug-related SVT symptoms and psychological exacerbations; require frequent supervision; and be precluded from working at unprotected heights or around moving mechanical parts or operating a motor vehicle because those activities were inherently dangerous when under the influence of substances. (Tr. at 36). The ALJ ultimately concluded that Claimant was disabled considering substance abuse disorder. Thus, the ALJ evaluated whether her DAA was material to the finding of disability. The ALJ determined that Claimant would not require the absenteeism or supervision RFC restrictions, and she could more frequently be exposed to hazards and operate a motor vehicle, if she was not abusing substances. (Tr. at 42). Considering Claimant's RFC and vocational factors without the DAA, the ALJ found that Claimant could perform other work that existed in significant numbers in the national economy and was not disabled. (Tr. at 43-44). Therefore, the ALJ concluded

that Claimant's substance use disorder was a contributing factor material to the determination of disability because Claimant would not be disabled if she stopped using substances. (Tr. at 44).

Claimant's primary issue with the ALJ's analysis is that the ALJ did not rely on any medical opinion regarding the materiality of her substance use. (ECF Nos. 6, 8). She argues that the ALJ relied on his own lay opinion that her substance abuse disorder was a contributing factor material to the determination of disability. (ECF No. 6 at 2). In her view, the ALJ should have solicited a medical opinion "because SSR 13-2p explicitly contemplates an ALJ relying upon a medical expert opinion in evaluating the critical and complex issue of materiality." (*Id*. at 5). Contrary to Claimant's assertion, nothing in SSR 13-2p, or any other statute, rule, or regulation, required the ALJ to solicit a medical opinion or otherwise develop the evidence so long as the record was sufficiently developed for the ALJ to make a decision. SSR 13-2p does not "explicitly contemplate" that the ALJ rely on medical opinions in determining materiality, as Claimant argues. In fact, SSR 13-2p unambiguously states that the finding about materiality is an opinion on an issue reserved to the Commissioner under 20 CFR 416.927(e). SSR 13-2p, 2013 WL 621536, at *8 n.19. Thus, the ALJ will not ask a treating source, a consultative examination provider, a medical expert, or any other source for an opinion about whether DAA is material. *Id*. An ALJ can ask for medical opinions about the nature, severity, and functional effects of a claimant's impairment(s). *Id*. In cases involving physical impairments, the ALJ ***may*** ask for medical opinions that project the nature, severity, and functional effects if the claimant were to stop using drugs or alcohol. *Id*. (emphasis added). In cases involving mental impairment(s), the ALJ will not ask for such projections. *Id*. As clearly stated in SSR 13-2p, the ALJ alone determines whether

DAA is material to the determination of disability. SSR 13-2p, 2013 WL 621536, at *14. Claimant's argument that a medical opinion was required on this issue is unpersuasive.

Moreover, contrary to Claimant's assertion, the ALJ properly explained and supported his finding that Claimant's substance use disorder was material to the disability determination. ALJs "must provide sufficient information in their determination or decision that explains the rationale supporting their determination of the materiality of DAA so that a subsequent reviewer considering all of the evidence in the case record is able to understand the basis for the materiality finding and the determination of whether the claimant is disabled." *Id.* at *2. The ALJ did so in this case. He explained that Claimant went to the ED for SVT in 2019 through 2022, but the symptoms promptly resolved with medication. (Tr. at 32-33). Her cardiac examination during her April 2021 consultative examination was normal. (Tr. at 33). The ALJ acknowledged that the foregoing records did not indicate a cause or trigger of Claimant's SVT symptoms, but later records attributed her SVT exacerbations to cocaine use. (Tr. at 33-34, 36, 42). The ALJ concluded that it was clear from the totality of the record that Claimant's cocaine use exacerbated, if not outright caused, her SVT flare ups requiring medication administration. (Tr. at 34). The ALJ noted that Claimant's SVT symptoms quickly resolved upon administration of medication. (Tr. at 42).

The ALJ's comprehensive analysis and findings are supported by the evidence of record. Although Claimant denied using drugs and was not tested for them during her earlier visits for SVT, she was admitted to Highland Hospital in July 2022 after doing "a lot of cocaine." (Tr. at 3546). She claimed that she used cocaine four times in the past few days and never took it before, but the provider recorded that Claimant likely used cocaine more than a few times and was not very open about it. (Tr. at 3542). It was

suggested that Claimant go to a sober living house, but she refused. (Tr. at 3546). In September 2022, Claimant went to the ER for rapid heartbeat. (Tr. at 3754). She again denied alcohol and substance use. (Tr. at 3756). However, Claimant was drug tested at that point, and her urine screen was positive for cocaine. (Tr. at 3762). Claimant was diagnosed with "substance abuse, SVT." (Tr. at 3763). Claimant refused a treatment referral, but she said that she would speak to her doctor about detox. (Tr. at 3756). Approximately one week later, Claimant presented for a psychiatric evaluation to detox from alcohol and cocaine. (Tr. at 3846). Claimant expressed that she began using cocaine when she was 38 and was sober for seven years before she started using again in January. (Tr. at 3846). This was contrary to Claimant's statement that she just started using cocaine in July and only did it a few times. (Tr. at 3542). Subsequently, during a September 16, 2022 evaluation, Claimant admitted to drinking two tall cans of beer and snorting two grams of cocaine per day. (Tr. at 3846). She conceded that she used cocaine every night for about three months and was taken to the ED four days earlier for SVT with a heartrate over 200 due to cocaine usage. (Tr. at 3857). When Claimant returned to the ED for SVT on October 28, 2022, Claimant still denied using substances. (Tr. at 3651, 3657). Yet, the provider noticed that Claimant had a history of frequently visiting the ED for the same symptoms and being treated with adenosine and discharged. (Tr. at 3657). Claimant's urine screen was positive for cocaine, despite her claim that she did not use drugs. (Tr. at 3657-58). Claimant refused a stress test and was warned that she was at risk for a heart attack due to her associated cardiac condition and cocaine use. (Tr. at 3664).

In sum, there is more than a scintilla of evidence to support the ALJ's determination that Claimant's cocaine use exacerbated, if not caused, her SVT. The ALJ

explicitly recognized that Claimant had multiple ED visits, which did not directly link her SVT to her substance use. However, the ALJ weighed that evidence against the instances in which Claimant was drug tested while experiencing SVT symptoms, and her urine tests were positive for cocaine. This was the ALJ's function as fact finder. Claimant does not identify any conflicting evidence that the ALJ misconstrued or overlooked, nor does she show any other flaws in the ALJ's analysis of her SVT that warrant remand.

Claimant also takes issue with the ALJ's "lay speculation" that her only inpatient admission for mental health treatment was predicated upon drug use. (ECF No. 6 at 4). However, this statement is also directly supported by the record. As noted, Claimant was admitted to Highland Hospital in July 2022 after "doing a lot of cocaine," and she was diagnosed with stimulant-induced mood disorder; bipolar disorder, depressed type; and cocaine use disorder. (Tr. at 3546). As the ALJ explained, Claimant otherwise had generally normal mental status examination demonstrating control of her symptoms with medications. (Tr. at 34-35). Therefore, there is more than a scintilla of support for the ALJ's assessment that Claimant's voluntary psychiatric admission was predicated upon drug use. (Tr. at 35). Furthermore, the ALJ did not discount Claimant's mental symptoms or impairments. The ALJ found that Claimant still had the same mental RFC limitations notwithstanding her substance use given her performance during the consultative examination and within treatment records. Excluding DAA, the ALJ still restricted Claimant to simple and repetitive tasks, occasional interaction with coworkers and supervisors, no interaction with the general public, and a low-stress work environment defined as no more than occasional changes in a routine work setting. (Tr. at 41-42). Although Claimant would not require frequent supervision or be absent from work 12 days per year if not for her drug use, the ALJ clearly recognized and thoroughly

discussed Claimant's mental functional limitations apart from her DAA, and the analysis is supported by substantial evidence.

For all of the above reasons, the undersigned **FINDS** that the ALJ correctly applied the law, and his decision that Claimant's substance use disorder is a contributing factor material to the determination of disability is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's motion for judgment on the pleadings, (ECF No. 6); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 7); **AFFIRM** the Commissioner's decision; and **DISMISS** this action and **REMOVE** it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir.

1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** May 14, 2024

Cheryl A. Eifert
United States Magistrate Judge